Good morning. We have four appeals to hear this morning. Counsel, we're familiar with your cases. We've read your briefs. The authorities cited in your briefs at least portions of the record. So in the limited time that you have this morning, you should just feel free to get straight to the heart of your argument. We're probably going to have some questions. Be mindful of the traffic lights. When the red light shines, it's time to wrap it up. If you're answering a question from the court, of course, you can finish your answer, but do be mindful of our time. If you're answering a question from the court and you're continuing, you're not going to lose any rebuttal time. Don't worry about that if that's something you have. So our first case this morning is United States v. Kendrick. Ms. Goodman, will you please come speak with us? Good morning and may it please the court. My name is Olivia Goodman and I represent the appellant Michael Kendrick in this matter. This is a criminal direct appeal following Mr. Kendrick's trial in the District Court for the Middle District of Florida in Ocala. Certainly, I'll address the issues in whichever order the court prefers. My intention would be to begin with the first issue, the motion to suppress. Mr. Kendrick filed in the District Court a motion to suppress, two motions to suppress rather. The first was for an unlawful traffic stop, illegal detention, and an unlawful search following that traffic stop. The first argument that was raised is that the officer did not have probable cause for the traffic stop. Officer O'Grady was the officer that conducted the traffic stop in this matter. The facts are well litigated. The problem it seems to me that we have with that is that the magistrate judge credited the officer's testimony about what the officer saw. I don't see where we could overturn that. The District Court can credit an officer's testimony so long as it's not so implausible that it defies the laws of nature or something like that. I'm not sure how we can possibly overturn that. Absolutely, Your Honor. I appreciate that. Certainly, this court does give due deference to the lower court's credibility findings and you're absolutely correct. This is a case that came down to the credibility of the officer that conducted the stop. I would submit that Officer O'Grady's testimony does to an extent defy the laws of probability given her testimony. There's a difference between the laws of probability and say, the law of gravity or something like that. It does seem to me that it's at least possible that the officer saw what the officer testified to see. I'm not sure that I would agree that it's possible that the officer saw given the testimony that was provided. I do understand that the investigator for the public defender's office that was conducting what has been termed a recreation, it's a different vehicle, it is a different mirror. However, she also, when she performed that investigation, noted that there were trees obscuring the officer's view. In addition, the officer also testified that she did see the vehicle come to a complete stop and use a turn signal. Also, importantly, and I'll move on because certainly I don't want to belabor the issue, but Officer O'Grady didn't conduct a traffic stop when she apparently witnessed this traffic violation and instead followed the vehicle around for at least some period of time, watched the vehicle pull into a driveway, and then she hasn't initiated lights or sirens or anything at this point, loops the block and loses sight of the vehicle. She does see the vehicle on the roadway a short time later. However, I would assert that at that point, if somehow she witnessed a traffic violation, she had not conducted a traffic stop at that point when she witnessed that violation and now not knowing what's now happened when she's lost sight of the vehicle looping the block, I believe that the argument probably falls under something closer to reasonable suspicion. That's what I would submit to this court. She's lost probable cause for a traffic violation simply because she did not stop the vehicle immediately? I would say, and I'm not certainly, Your Honor, I'm not making the argument that that would happen in every circumstance, but in this circumstance, the vehicle pulls into a driveway, pulls out, turns, I'm sorry, turns off the vehicle, comes to a stop, and when she loses sight of the vehicle, she has no idea when she sees the vehicle later whether it's the same driver, whether somebody else has gotten into the vehicle, and given also that I believe that part of her testimony was that she was trying to get tag information, I'm not certain that the record is entirely clear that she is seeing the same vehicle, which is why I would submit that the argument falls under something closer to reasonable suspicion of criminal activity at the second stage when she pursues the vehicle for a second time. You've mentioned that the investigator concedes that the investigator did not duplicate the conditions that O'Grady witnessed the traffic stop. It was a different vehicle. The officer had a police mirror, which is a completely different setup. There were different conditions. The investigator did not wait to see if the investigator could observe a car there at that same stop sign. Why are those differences not determinative in this case? Why do all those differences not cast out on the investigator's opinion? It's certainly true the investigator was not using the same vehicle, but the investigator is stopped on the same roadway. She stopped in the same turn lane at the same distance, which is a distance of almost 600 feet. That's quite a distance, and I don't see that the difference in the mirror, which the police mirror may be of a stronger caliber to see something different, but it wouldn't see through trees. I submit that it's not determinative in this case for that reason. I don't see how we can say that there was only one inference that the officer would have had to see through trees when the expert's testimony or the opinion testimony is essentially not created under the same conditions, not the same kind of vehicle. We don't know exactly the location of the person trying to recreate the event. If the officer testifies, this is what I saw, and the magistrate judge credits it. It seems to me we're stuck with it. Once again, looking at the Stancil case, I wouldn't necessarily agree with that characterization that you're absolutely married to the credibility findings, although certainly, as I've said, due deference is given to credibility findings at the lower court at that level. I acknowledge that without conceding that it's completely dispositive for this court. Do you want to move on to something else? Absolutely. Thank you, Your Honor. I'd like to touch on the issue of the motion to suppress Fifth and Sixth Amendment violations, the Miranda violations in this case. This is after the federal officer's arrest? Correct, Your Honor. Yes. He signs a waiver form? He does sign a waiver form, Your Honor. He does. The federal officers, while Mr. Kendrick was attending a state court hearing, the federal officers came and lawfully apprehended him to take a DNA sample and to take him into custody. It's undisputed at this stage, or it was in the district court below, that this was a custodial interrogation. If there were not a valid waiver, he would have a right to counsel, and he would have a right to silence. He was given a written waiver by the federal officers, admittedly. He signed that written waiver, admittedly, that was entered into evidence in the district court below. In denying the motion to suppress, the district court below was highly focused on that waiver as dispositive. It is certainly- Just running to the issue on the motion to suppress, can you speak, or actually in terms of the waiver, can you speak to the distinctions between knowing, involuntary, and then intelligent? Because I think that as you're acknowledging he signed the waiver, it seems he knew what he was signing. He voluntarily signed it, but then in his dialogue says he doesn't know. So that to me raises the question of whether it was an intelligent waiver. Can you speak to that in particular? Yes, Your Honor, and I would agree with that characterization to an extent that he certainly signed the waiver, but his statements while the officers are now confronting him after signing the waiver, he indicates, I know that I've signed my, you know, I know you read me my rights, but I don't really understand, or I don't really know. And I believe that that raises questions whether that waiver was intelligent. A knowing waiver would be, obviously you've been given your rights, and he has in this case, he signed an express waiver. A voluntary waiver would be that he is not doing so under coercion. He's not being tortured or, you know, otherwise. And the waiver says that he's not being coerced, right? Correct, Your Honor. So I want to make sure I understand what the exact sequence here is. So the detective reads him his Miranda rights. He says he understands them. He signs the written waiver. Then the officer confronts him with DNA evidence on the gun, to which he says, you never asked, and I touched it. He tells the detective that other people were in the car with him on the night of his arrest, and his cousin was willing to testify that he was in the car. And then the detective asked for more information about his cousin, and then your client says, I know you read me my rights and stuff. I really don't know. You know what I'm saying? That doesn't strike me as, I don't understand my rights. That's like, I'm not sure I want to keep talking, but it's equivocal. Well, yes, Your Honor. I would partially agree with the sequence of events that you've laid out. I believe that the sequence of events was that he was taken, he was given the form. I don't believe that the officer testified that the rights were read before the form. I think that the appellant started asking questions of the officers, and the officer said, well, if you're going to talk to, if we need to talk to you, this is a custodial interrogation, and gave him the form. He signs the form on his life. I think to the Chief's point, and this is my challenge as well, if we look at his comments in isolation, you could argue that the I don't know means I'm not really sure what I'm waiving. But the fuller context suggests he doesn't want to give more information about the offense that he was accused of committing. And so how, to err on the side of that he didn't understand, what other facts can you provide? The other facts that I would provide is that this was this invocation, as I would call it, or this question, this equivocal question as to whether or not he understands his rights relate to when he's being confronted with, why would your DNA be on this gun? And when he says, I really don't know, the detective starts to respond to that, I believe, and he interrupts the detective's response by saying, but I'll give you that much, I ain't got nothing to hide. Right? That's true, Your Honor. Okay, so that's a full context. Yes. And I see that my time has now expired, so I'll just briefly conclude by noting that I'll rely on all other issues as pled, and I'll save for the comments for rebuttal. Thank you. Thank you. Ms. Hotman. Thank you, Your Honor. May it please the Court, Karen Hotman for the United States. I'd like to briefly touch on a couple facts that may be misapprehended in the record for each issue, and then I'll concentrate on Your Honor's question about the Fifth Amendment, knowing voluntary and intelligent waiver. With regard to the suppression hearing, it was interesting listening to the Fourth Amendment argument, but I would like to remind that there are two questions at issue for a Fourth Amendment suppression motion. One is the Fourth Amendment violation, and the second is the exclusionary rule. So we've heard, I think, a bit more today about a different theory of causation. I'd like to remind the Court that also there was a second detention in this case, the Taser detention, that was not actually challenged, and that that would break the chain of causation between the traffic stop and anything else. How does that work? I mean, the initial stop was for failure, I think, to stop at a stop sign, and then the police officer follows him. My recollection is he stopped in two different driveways, then gets stopped, and then runs. Yes. What is the disconnect there? I'm responding to my sister's argument of a reasonable suspicion stop for a second stop if the officer lost probable cause and then had only reasonable suspicion for the second stop. Then when the officer is giving the commands to stay in the car, etc., and the defendant runs, that is obviously probable cause for obstruction. That's probable cause, and the Court actually touched on this as well, I think. But I was just adding that because of my sister's argument about a reasonable suspicion second stop. We hadn't heard that before. The traffic stop certainly is valid for all of the reasons touched on already, but I was responding to this possible other Fourth Amendment argument, Your Honor. And is it true? I mean, on one end, it sounds like you had the police officer say he didn't stop, so I followed him, didn't arrest him in real time, waited a significant amount of time, even though this is a relatively short period of time. And then, I guess, to your point, arguably, this new argument or issue being raised, then reasonable suspicion comes in. I guess I'm just trying to understand if we have two different versions of what happened, and you have an expert that says the police officer could not have witnessed this stop, are we stuck so perfectly, so squarely with this credibility determination? Well, Your Honor, not only did the Court squarely find that the officer's testimony was clear, unequivocal, and credible and supported, but the jury then found that the testimony was credible. As my sister said, the issue in this case was the credibility of the officer's testimony. This was fought out again at trial, and defense counsel carefully presented the same evidence from the suppression hearing to attack credibility once again. In fact, that was an issue of great import before the Court, and so the jury actually found credibility as well. So yes, I think that Your Honor should defer the credibility final. I'm going to touch briefly on the sixth amendment issue, the supplemental jury instruction issue. I know that that wasn't discussed, and I know I'm opening myself to rebuttal, but I did want to point out something that we did not highlight in the brief for the supplemental jury instruction. The argument was that there was a prejudice attached because defense counsel was not able to argue the Timmons factors. Actually, the district court, before instructing the jury, told the parties that part of the definition of infuriance of comes from Timmons and that they could argue the factors. I just wanted to put that before the court in case there is a question as to the chain of events and the prejudice for the supplemental jury instruction argument, and that is at document 209, page 129. I did not realize until prepping that we had not highlighted that. So now I'm going to turn back to the fifth amendment issue and Your Honor's questions about knowing voluntary intelligent. I'd like to point out that in the briefs there seems to be a bit of misunderstanding about the statements being challenged. My sister today squarely challenged the February 2020 statements. There were also statements given after the Buchholz Schwab in September 2019, and in the briefs, and I noted in the reply brief, we were faulted for not responding to particular arguments, but there is a problem in the briefs because some of what is cited comes from that first set of statements from the Buchholz Schwab. So I am going from, as I believe Your Honors are going from, Exhibit 25T is what I'm looking at for the actual statement in front of the courthouse in February 2020. But I'm also looking back for context from September 2019 and wanted to emphasize that that statement has never been challenged. It was not challenged as the motion to suppress. I believe it was basically abandoned again at trial, but we're not dealing with that. I'm going to use that for context. So if we go to the transcript and look at the statement that Your Honor asked about, as Judge Pryor already pointed out, in context of the statement itself, it is in response to a question about the defendant's possible cousin and wanting to get information about the cousin. What's important about the September 2019 statements, which are in, I believe, 23T is what we put in at trial, sorry, is that entire conversation was about cooperation, was about possibly giving up the people whom the defendant said were in the car. So Agent Newsom in September 2019 had a whole conversation about possible cooperation. And if you read that conversation and the 220 conversation, it becomes even clearer that this was not some sort of attempt at invocation. Definitely not an unequivocal or unambiguous invocation of anything, but it was not an attempt at invocation at all. It was a continuance of the conversation that the agent had been having with him about potentially cooperating. Concerning the actual knowing, voluntary, and intelligent, Your Honor, the intelligence, these are difficult terms to tease out and they're talked about altogether often, but I would point to the sentencing transcript where the sentencing court actually interacted with the defendant, lauded his intelligence, lauded his articulation, his ability to understand. We did mention that in the brief, but we did not highlight it. So if you are parsing out knowing, voluntary, and intelligent, I would look there for intelligence. Voluntariness, of course, we would look to the waiver. We would look to what you can see on the video and also in the transcript. The knowing, I think, is what my sister has focused on in a couple different ways, trying to say that the statement that we are talking about with, I don't know, I'm going to maybe give you this or maybe not, shows not knowing. Another way that you could show not knowing, and I think that they have attempted to at some point, is under Moran with the atmosphere of the interview, all of the surrounding circumstances, and they used a case called Hart, I think, to try and tease that out. But knowing, there's just nothing here that suggests that he did not know what he was doing. We have the waiver. We have the previous waiver as well on September 2019. So again, context. He knows how to waive his Miranda rights. He's done it before. He's spoken with the officers, and he's doing it again now. But you mentioned Hart, and in Hart, I think the language was something like, honesty wouldn't hurt you. In here, it's something like, you can only help yourself. So why doesn't Hart speak to this scenario? Your Honor, the you can only help yourself was September 2019, and that's the disconnect here. So there might have been an argument, and I will address that certainly under Hart right now, but those statements were in September 2019. Those have not been challenged. Again, there was a bit of a confusion in the briefs, and I don't think that we highlighted it properly. But turning to Hart, the Hart case was about a Sixth Amendment right to counsel. Here, this has been not only abandoned, but specifically disclaimed. Any Sixth Amendment based on the waiver, I have the site for that, I think. I'm sorry, Your Honor. One moment. May I grab my notes? Okay. So at DOC 208, at 7 to 12, there's an extensive conversation with the Defense Counsel where they are actually revisiting the Fifth and the Sixth Amendment issues in the context of trial to try to put evidence before the jury. And counsel specifically says at 208 at 6, it's not suppressible because of that. He's talking about a Sixth Amendment, possible Sixth Amendment violation in the car outside the courthouse. So I would recommend looking at that entire exchange. It was very confusing for the district court, but he drilled down and allowed them to put evidence of all of this before the jury to try to argue that this statement was less credible or less reliable. But they revisited the Fifth and the Sixth Amendment. So back to Hart. In Hart, that was an officer who was basically advising the defendant about the contours of his Sixth Amendment right. The court carefully went over what the law was about. It was about a right waived under the Sixth Amendment. The officer basically was advising why you would invoke counsel or not. Here, at most, we have some sort of argument that the interaction, even if we are taking September 19, and again, that was not an issue. But were we actually looking at that, we would be talking at most about the Fifth Amendment right to silence. And there is nothing that that officer said which, number one, has not been specifically sanctioned by, I think, this court. But also, there is nothing that officer said that went to the right to silence. The officer was talking about cooperation and was talking about what happens if you talk to us. And that waiver says the same thing. If you talk to us, anything you say can and will be used against you. Or, I don't know, it says will. Can. I'm thinking more of a TV show, probably. But can be used against you. So Hart would not apply, even if we were talking about September 2019. But we're not. We're talking about February 2020. And the only thing that counsel has pointed to in February 2020 is that phrase, I don't know or I'm not sure, and then to talk about possible cooperation or not. I think that is all that I meant to talk about. Would your honors like to ask any questions about anything else? Ms. Hopman, we always appreciate time being returned to us. You're welcome, your honor. Ms. Goodman, you've saved three minutes. Well, I have a quick question about Timmons. Because I understood your argument to suggest that every time a jury requests clarification and the judge provides it, that creates a new opportunity for notice and an opportunity, I guess, for the defendant to be heard. Or what is your actual argument around Timmons? So, your honor, our argument regarding the jury instruction or the supplemental jury instruction. So, Timmons was discussed in the district court below before they ultimately moved on to, they called it Kenneth Petwell, but I believe the citation is actually United States versus Black in the Second Circuit. So then you do agree that the court notified your client that Timmons would be used for the jury instruction. And at that point, your client had an opportunity to argue in favor again. Yes. Our argument, and perhaps it wasn't highlighted in the brief, because I do believe that both arguments were made to an extent notice. But really, I think the crux of our argument for the jury instructions issue is that the defendant and his counsel had already made their argument as to how the jury could make a finding one way or another about in furtherance and what it would mean, what the government would have to provide for the jurors to make a finding that Mr. Kendrick had a weapon in furtherance of a drug trafficking crime. And they made their argument based on that pattern jury instruction. And then this is somewhat of a unique case, at least in my opinion, for a 924C or an argument in furtherance of a weapon in furtherance of a drug trafficking crime. Because this case, there was no nexus outside of the presence of the weapon in the vehicle. The weapon certainly wasn't registered to Mr. Kendrick. The vehicle wasn't registered to Mr. Kendrick. And there were no facts showing that he brandished the weapon or really that he knew that the weapon was there. And then, of course, there was other evidence that was brought in that there were other people in the car that may or may not have owned the weapon. $1,800, drugs. I mean, there was a lot of other evidence around the gun. Yes, there were. In a separate part of the vehicle, there were scales and baggies and then the package that fell to the ground, the Eutalon. But at the same time, Eutalon is, I won't say it's an unusual drug to be trafficking, but it's certainly not one that we see every day in drug trafficking organizations where people are armed trafficking with something like Eutalon or Pentalone. But it was packaged in like 29 individual baggies, which, and with the scales, isn't that suggestive of trafficking? Absolutely. I will concede that packaged Eutalon is suggestive of trafficking. However, the question, in my opinion, centers more on the connection of the gun to the trafficking because that separate charge of having the weapon in furtherance of the drug trafficking organization. Can I ask you a question about that? So on the supplemental charge, as I understand it, you are not saying that the district court got it wrong because it misstated the law or confused the jury. You're proceeding under it was prejudicial to your client, correct? Correct. And so from the briefing, you have suggested that it is prejudicial because it is a correct statement of the law, but you did not have the opportunity to respond to these factors in closing. And what I'm trying to get at is, aren't you making an argument that would suggest that any time a supplemental charge is given after closing arguments, that it's always going to be prejudicial then? Because there's never going to be a situation then where defense counsel has had the opportunity to respond to that specific statement of law. I'm not making that argument, that bright line rule that supplemental jury instructions are always prejudicial. And the reason why I'm going over those facts and the unusual facts in this case that I believe are unusual because I think it was prejudicial in this case where he was not given the opportunity to argue these factors, where there was somewhat attenuated evidence of this particular weapon being used in furtherance of a drug trafficking crime. And these extra factors perhaps moved the jurors to convict where they would not have otherwise on that charge. And I see that my time has expired. Okay. Thank you, Ms. Goodman. We understand your argument and we're going to move  Okay.